(39 Misc. Rep. 197.)

### CUNNINGHAM et al. v. CITY OF NEW YORK.

(Supreme Court, Trial Term, New York County. November, 1902.)

1. MUNICIPAL CONTRACTS—PERFORMANCE—ERROR IN PLANS.

   Contractors entered into a written contract with a city for the building of a sewer under an agreement to prosecute the work from as many different points and at such times as the city might determine, and to keep the work free from water at their own expense. They had full opportunity to examine its location. *Held*, that they could not, after completion of the work and payment, recover for extra work upon the ground that they relied upon the plan of the work furnished by the city, which falsely indicated another sewer as then existing, and that, if the other sewer indicated had in fact existed, they could have drained the water from their work into such sewer, and saved the cost of pumping the same.

Action by William P. Cunningham and Philip J. Kearns against the city of New York. Verdict for plaintiffs. Motion by defendant for new trial granted.

Kellogg & Rose, for plaintiffs.

George L. Rives, Corp. Counsel (Chase Mellen, of counsel), for defendant.

HALL, J. The plaintiffs contracted with the defendant on March 18, 1898, for the construction of a sewer in East 179th street, between Lafontaine and Arthur avenues, and in Arthur avenue, between East 177th and East 181st streets. Arthur avenue runs practically north and south; 179th street and the other numbered streets run practically east and west. The grade of Arthur avenue rises both to the north and south from 179th street. The grade of 179th street slopes to the east from Arthur avenue to Lafontaine avenue, and there seems to be little question but that the sewer contracted for was intended at some time to have its outlet into a sewer in Lafontaine avenue and 178th street. The plaintiffs completed their contract, and received payment in full. They brought this action to recover damages for extra work in making the excavation for the sewer and for pumping the surface water from the trench during the progress of the work, and for extra expenses of superintendence, which damage they claim was caused by the defendant in failing to remove a building which stood on 179th street near Lafontaine avenue, and which had been condemned in opening 179th street, by reason whereof the plaintiffs claim that they were prevented from commencing work at Lafontaine avenue, when, they assert, there was to be a sewer which was intended to furnish an outlet for the water which ran into the sewer during the construction of the sewer which they were to build. The plans and specifications, as well as the contract in question to which they relate, were put in evidence. The plan, in addition to showing the general construction of the work, has upon it certain dotted lines on Lafontaine avenue, which the evidence shows was the usual manner of indicating an existing sewer. Plaintiffs claim that, as the plan was a part of the contract, they had a right to rely upon the fact, and, in making their contract, to assume that the city intended that the 179th street part of their sewer should connect at once with this outlet sewer, and thus furnish complete drainage for all water flowing into or accumulating in the sewer excavation during the progress of the work, and that both plaintiffs and defendant entered into the contract in contemplation of that fact.

If the evidence sustains this view, there is no reason for disturbing the verdict, which was for a very moderate sum, and much less than the damages proven to have been sustained. It is necessary to examine the facts leading up to the contract and as they existed at the time the same was made. The plaintiffs, before bidding for the work, went on the ground, and examined the existing conditions. They saw the building which they claim obstructed the street through which the sewer was to be built, and they saw that there was in fact no sewer in Lafontaine avenue at 179th street, but there was a sewer under construction in 178th street, running east from Third avenue, and which was to be continued to and along Lafontaine avenue up to and past 179th street. After the making of the contract, and when plaintiffs were ordered to proceed, in March, 1898, the sewer in Lafontaine avenue was not completed within a long distance of 179th street, and therefore at that time, and up to May, 1898, there was no outlet sewer for the water to drain into. The plaintiffs claim that they were first ordered to commence work at Lafontaine avenue and

179th street, but could not go on because of the building which obstructed the roadway, and they were then ordered to proceed with the Arthur avenue section, which they did, and after that was finished they worked eastwardly through 179th street, and were compelled to pump all the water from their excavation, etc., which would have been avoided except for the obstruction referred to and the failure of the defendant to provide the outlet. But it is quite patent that, if there had been no obstruction in the street when they commenced work, they would have been compelled to do the pumping, as there was no outlet built through which the water could run off until about two months thereafter. The contract is in writing. Its terms are clear and unambiguous, and, so far as I have been able to discover, it contains no reference to any existing sewer, and makes no provision for any outlet for water in the excavation during the progress of the work, excepting the marks or lines upon the plan which are said to show the existence of a sewer in Lafontaine avenue; but I doubt very much whether the designation of such a sewer upon a plan could overcome the plain language of the contract. Dean v. City of New York, 167 N. Y. 13, 60 N. E. 236, opinion of Judge Gray, at page 18, 167 N. Y., and page 238, 60 N. E. The language of the opinion in that case is instructive upon the point referred to:

"The contract expressed, and was intended to express, the agreement of the parties to it, and measured the extent of their several obligations; while the plan, in accordance with which the contractor agreed to complete the work, was the chart by which he was to be guided in its performance. There was no ambiguity, no uncertainty, in the language of the contract, and a plan could introduce none. * * * A plan was necessary, and the contractor was bound to observe it; but it did not express his obligation. It illustrated its nature. It did not control the contract awarded by the representatives of the municipal government."

The following references to the provisions of the contract illustrate the duties of plaintiffs under it:

"The work is to be prosecuted at and from as many different points, at such times, and in such part or parts of streets, avenues, and parks on the line of the work, and with such force as the said commissioner of sewers by his engineer may from time to time during the progress of the work, determine," etc.

This would seem to dispose of plaintiffs' contention as to their right to begin the work at Lafontaine avenue, and prosecute it at all times so as to carry the surplus water into an outlet at that point.

"The contractor, at his own expense, shall keep all the trenches, while the excavation or the construction of foundations and sewer is in progress, free from water, and shall provide and keep in operation on the work a steam pump or steam pumps of approved capacity at all times when notified to do so by the engineer, and shall provide for the disposal of the water so removed in such manner as shall not cause injury to the public health or private property, nor to any portion of the work completed or in progress, nor to the surface of the street, nor cause any impediment to the use of the same by the public."

The specifications call for the bid to include "cost of furnishing and operating all pumps required to keep the work entirely free from water." These provisions would seem to contemplate that the only way in which the accumulations of water were intended to be removed

from the trench 'was by means of suitable pumps, to be provided by the plaintiffs; and to negative any claim that an outlet for the water was to be furnished by the city through any sewer. This is emphasized and made patent by the evidence of plaintiffs' witnesses that, in case the outlet had been supplied, there would have been no greater accumulation of water in the trench than could have easily been bailed out by a boy, and then only in the bottom of the trench where it was below the concrete bed and the under wall of the sewer. In fact, the witnesses sought to minimize this work, and to show that it was of no importance whatever, and had scarcely been considered in their estimate of the cost of keeping the trench free of water. Again, the contract provides, on page 15:

"All loss of damage arising out of the nature of the work to be done under this agreement, or from any unforeseen or unusual obstruction or difficulties which may be encountered in the prosecution of the same, or from the action of the elements, is to be sustained by the contractor aforesaid."

And again, on page 23 of the contract:

"The contractor shall, at his own expense, pump out or otherwise remove any water which may be found or shall accumulate in the trench, and shall form all dams or other works necessary for keeping the excavation clear of water during the progress of the work."

But perhaps the clause in the contract which operates most effectually against the plaintiffs' contention is found on page 28:

"The building of the sewer shall commence [the printed words 'at the existing sewer in' are stricken out] as shown on the plan of the work, and proceed as may be directed by the engineer."

How is it possible for plaintiffs to claim that the defendant agreed to furnish them an outlet through the sewer in Lafontaine avenue, in view of this language? There are many other provisions in the contract which negative the idea that the defendant promised or the plaintiffs understood that they were to have an outlet through the Lafontaine avenue sewer, which was not built. It would require much stronger evidence than the drawing of lines upon a plan, which are said to indicate a completed sewer, to overcome the very plain language of the contract. But, even if an existing sewer was indicated upon the plan, the plaintiffs were not deceived; for they examined the premises, and knew that there was no completed sewer there, and they knew that if it was designated on the plan it was an error. The plaintiffs' contention in this regard, as I gather it from the brief of counsel, is that although the sewer was not built in Lafontaine avenue at the time the contract was made, or at the time plaintiffs were directed to proceed with the work, the defendant was bound to wait until the completion of the outlet before ordering plaintiffs to proceed, and then was bound to order them to proceed from the outlet, and not elsewhere. This claim is specifically negatived by the provisions of the contract in regard to the times and places for commencing the work.

The case of Del Genovese v. Railroad Co., 13 App. Div. 412, 43 N. Y. Supp. 8, is not an authority for the contention of plaintiffs. The provisions of the contracts were entirely different. There can be no question of the soundness of that decision, but it has no application to the facts of the case at bar.

The case of Horgan v. City of New York, 160 N. Y. 516, 55 N. E. 204, seems to be an authority in favor of plaintiffs, until an examination showed that the facts were entirely different. In that case the contractor had agreed to excavate and remove all the sediment and other materials deposited in the bottom of the pond in Central Park near Fifty-Ninth street. The contract provided for the drainage of the water through a circular gate resting on the bottom, and connecting with a sewer. The court of appeals held that the plaintiffs had a right to assume that the water could be drained off through this sewer, and that his contract to clean the bottom did not contemplate that he should pump all the water out of the lake, but only such part of it as was lying below the standpipe, and in the uneven surface of the bottom. The sewer became stopped up and useless, and the contractor was compelled to pump out the lake. It was very properly held that this work was not within the letter or spirit of the contract, and that the contractor was entitled to make an extra charge for the work.

I am therefore constrained to hold that the defendant was not bound to furnish an outlet for the water which accumulated in the sewer in question, either by the terms of its contract or by any fair implication.

The plaintiffs also base their right to recovery in this action upon the fact of the obstruction in 179th street near Lafontaine avenue. I have heretofore tried to point out the absolute unimportance of this alleged obstruction from the fact that, if it had not existed, the plaintiffs could not have commenced their work to any greater advantage at that point than at any other, so long as no outlet was provided. But I find in the contract, at page 12, the following:

"Any incumbrances or obstructions which may be upon the line of the work when it is begun, or may thereafter be placed there, shall, if directed by the engineer, be removed by the contractor at his own expense."

There is no direct evidence that the engineer ever gave any distinct directions to remove the building in question, but it is more than questionable whether the contractors were not rather obliged to seek the orders of the engineer for the removal of the building than to lay the basis of a claim of upward of $8,000 against the city by the framing. They did remove it afterward, and before the completion of the work, at their own expense, and it was not a very difficult piece of work, for they testify that it was removed in about 36 hours, and no claim is made in this action for the work. The building had been condemned long previous to the making of the contract in question. The title had vested in the city, and there is nothing to show that it would not have been just as easy for the plaintiffs to remove it at the commencement of the work as near its close. For the reasons stated, it was error to submit the case to the jury, and the verdict must be set aside, and a new trial ordered.

Verdict set aside, and new trial ordered.