LUKE H. CALLAN vs. GEORGE H. PECK, T. T.

JULY 10, 1914.

PRESENT: Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, J J.

(1)  *Municipal Corporations.  Contracts.  Evidence.*

In order to sustain an exception to the exclusion of a question to a witness, it must appear what the excepting party expected to prove by the answer and that he was harmed by the exclusion, and a party takes nothing by an exception, because the answer would have shown a state of facts to be true where no such offer of proof was made.

(2)  *Municipal Corporations.  Contracts.*

Plaintiff entered into a contract with a municipal corporation to do certain construction work in connection with building sewers.  Prior to submitting his bid he was shown a certain plan, showing an existing and proposed sewerage system and upon that plan there appeared to be an underdrain upon X street, which communicated with an underdrain on Y street.  The sewer and underdrain which plaintiff was to construct was to have started at X street, about 240 feet from Y street, and the underdrain was to have been connected with an underdrain that was supposed to be there connecting with an underdrain on Y street, and the sewer was to have run in a general northerly direction, with branches leading into different cross streets.  Plaintiff did not find any underdrain on X street and the commission decided to have plaintiff put in an extra 240 feet of underdrain on X street, the price being the same as for the rest of the work.

When plaintiff opened up the underdrain on X street to connect with the new underdrain on X street he found a stream of water.  Plaintiff claimed that he had been told that the underdrain on Y street was a "working underdrain" and the water showed that it was clogged, and hence was not a "working underdrain."

Plaintiff brought his action to recover for the work in pumping out the water from the Y street underdrain and for damage due to the water coming into the trench on X street and on the rest of the system, claiming that he was not obliged to have the same allowed as extras.  Plaintiff also maintained that the underdrain on X street had nothing to do with the contract and hence that the pumping was not required in connection with anything that he was doing under the contract.  Defendant claimed that while the underdrain was not originally referred to in the contract, yet it was such work as was impliedly required by the contract, under which plaintiff agreed to "do and perform all the work which may be required for the construction of sewer and appurtenances in accordance with the specifications herein contained and with the plans and directions made and *to be made* from time to time as the work proceeds."

There was a further provision that "new work shall be added when necessary to leave all in good working order.  Any changes or new work are to be

paid for as extra work solely on the valuation of the engineer, but depending on his decision whether the work done is or is not included in the work required of the contractor under this contract."

*Held*, that the construction of the additional underdrain was a modification of the original contract, to the extent of adding 240 feet of construction, or if considered a new contract, it was under the same terms and conditions as the original contract.

*Held*, further, that as plaintiff agreed to lay the underdrain on X street for a certain price, unless this was made subject to the written contract he was entitled to no further compensation for work incident thereto, even if such work was much more than he had anticipated. Further, if such work was within the contract or extra work he could not recover, for under the contract he was to do all pumping, and the contract expressly provided what prices he was to receive in full for furnishing all materials and labor and also for all loss or damage arising out of the nature of the work or from any unforeseen difficulty.

*Held*, further, that the contract provided how and for what plaintiff should be paid and he was limited strictly to such recovery.

*Held*, further, that the fact that it was stated that the underdrain on Y street was a working underdrain would not authorize recovery.

*Held*, further, that plaintiff could not recover even if it were considered as "extra work" since the contract provided that no claims for extra work should be made unless it should be done in pursuance of a written order from the engineer, and the engineer could not waive any of the provisions of the contract.

*Held*, further, that while the X street extension was not ordered by the engineer in writing it was ordered by the sewer commission and was new work necessary to put the system in working order and was to be treated as an extra or as a modification or extension of the contract, and the commission could waive the provision that the engineer should fix the price, and in every other detail the original contract was followed by the parties.

(*3*)   *Municipal Corporations.   Contracts.*

Mere knowledge that work is being done by one who has entered into a contract to do construction work, which is claimed to be "extra work" will not create a promise to pay for it.

(*4*)   *Municipal Corporations.   Contracts.*

A claim for extra work under a contract to construct a sewerage system, was subject to all the conditions of the contract which provided that plaintiff should not be entitled to demand payment for any of the work, except in the manner set forth in the agreement.

*Held*, further, that the contract provided that new work should be added when necessary to leave all in good working order and the work in dispute was added to the work originally specified and plaintiff was bound under the contract to do the work, but even if it did not come within any provision of the contract, the contract was so modified as to include the additional work.

*Held*, further, that the provision in the contract that "the engineer shall have the right to correct any errors or omissions when such corrections are necessary to the proper fulfillment of the intention of said specifications or plans," authorized the engineer to pass upon the necessity of ordering a short amount of extra pipe to make a connection at a point where it had been supposed there was a connection.

*Held*, further, that while if there had been a fraudulent misrepresentation as to the underdrain in Y street which was material and had induced the contract, plaintiff could have rescinded the contract after the discovery of such fact and sued on a *quantum meruit*, or could have ratified the contract and sued in deceit for damages, whatever misrepresentation there was if any was an innocent one and not of such a character as to permit rescission and even if rescission were possible plaintiff did not rescind, but elected to affirm the contract..

(*5*)   *Pleading.*

*Held*, further, that the action of the town in opening up the drain in Y street and pouring water into his trench even if true, would not permit an action upon the common counts in assumpsit on an implied contract to pay for pumping the water out and the damages from letting the water in, but his remedy if any would be for a tort.

ASSUMPSIT.   Heard on exceptions of plaintiff and overruled.

JOHNSON, C. J.   This is an action of the case in assumpsit brought by Luke H. Callan, of Bristol, against the defendant as town treasurer of the town of Bristol. The declaration contains a count on book account and certain common counts. No book account was introduced in evidence, but there was introduced in evidence a certain contract made by and between the plaintiff and the town of Bristol, and a notice to the town council relating to the claim that the plaintiff then made. The case was tried before His Honor, Mr. Justice Barrows, and a jury on the 3d, 4th and 5th days of December, 1913, and the justice presiding, having ruled out certain testimony, the plaintiff rested his case and a nonsuit was thereupon granted. Thereafterwards, he took the usual procedure to bring before this court certain exceptions, and he is now before this court upon his bill of exceptions as allowed by the trial justice.

From an examination of the bill of exceptions we think that most of the exceptions can be eliminated for the purposes

of this hearing, as they do not affect the question as to whether or not the nonsuit was properly granted.

The first exception, shown on page 126 of the transcript, related to the ruling out of the following question: "Q. —. Did you recommend any course?" The defendant had testified that the purpose of the verbal contract for the putting in of 240 feet of pipe, on Woodlawn avenue, to connect with the underdrain on Wood street was "so as to take the water away from my trench and drain the soil, the land, as the new work was constructed." Asked if that method was recommended by him or by somebody else, he answered: "Not by me." He was then asked the question to the exclusion of which the exception was taken. It seems to us that the question was properly ruled out for the reason stated by the trial judge. "THE COURT: It seems to me his evidence should be confined to showing the plans they adopted were not proper, then, Mr. Crafts. That does not involve saying he had some other plans which were better. His testimony must be limited to showing these plans were not proper." Moreover, the plaintiff later testified that he wanted to wait until he had completed his system before putting in the underdrain, but they decided that it would better be done then.

The plaintiff claims that the answer to this question would have shown that the plaintiff had another method in view as a substitute for the underdrain, viz.: the digging of a trench southerly from Woodlawn avenue onto private property by permission and then pumping accumulating water into the brook. He however made no such offer of proof and hence this will not avail him.

(1) In *O'Malley* v. *Commonwealth*, 182 Mass. 196, the court held that "in order to sustain an exception to the exclusion of a question to a witness, it must appear what the excepting party expected to prove by the answer and that he was harmed by the exclusion." See, also, *Farnum* v. *Pitcher*, 151 Mass. 470 at 475; *Carpenter* v. *Willey*, 65 Vt. 168; *Gage* v. *Trawick*, 94 Mo. App. 307; *Loker* v. *S. Mo. Elec. Ry. Co.*, 94 Mo. App. 481; *Greever* v. *Bank*, 99 Va. 547.

As to the second exception, if the nonsuit was properly granted, the question that was ruled out, to which the exception was taken would be immaterial. The question refers to the extra time taken doing the work and could only be material on the question of damages.

The offer of proof which is the subject-matter of the third exception relates to the same matter as the question which is the subject-matter of the second exception.

The fourth exception relates to conversations with the commissioners, or members of the commission, or the assistant engineers representing Mr. Gray. If the nonsuit was properly granted, this would have no bearing upon the case.

The offer of proof that is the subject-matter of the fifth exception relates to the question of damages and to like conversations as are referred to in the question that is the subject-matter of the fourth exception.

The offer of proof that is the subject-matter of the sixth exception is that the defendant's representatives, the sewer commission and the engineer, were at fault and responsible for turning this water on to them; that they turned the water on to them and that necessitated a lot of extra work for which they claim compensation and that they knew that they were doing this work and that they should claim extra compensation, but that they never agreed to pay compensation. If the nonsuit was proper, this offer of proof was properly rejected.

The seventh exception is the real basis of this proceeding and that relates to the granting of the defendant's motion for a nonsuit.

The facts of the case are, in brief, as follows: The plaintiff entered into a written contract with the town of Bristol to do certain construction work in connection with building sewers and their appurtenances. Prior to submitting his bid, he was shown a certain plan, showing an existing and proposed sewerage system in the town of Bristol, and, upon that plan, there appeared to be an underdrain upon Woodlawn avenue which communicated with an underdrain on Wood street.

An underdrain is a drain underneath the sewer proper. It is a sort of an open or porous drain. The pipes are left open and porous at the joints, so that water can get in from the surrounding soil. Sometimes they are of tile drain so that water can get in all the way. It is simply a drain to assist in caring for the water that is in the ground through and along which the underdrain runs.

The sewer and underdrain appurtenant thereto that Mr. Callan was to construct was to have started at Woodlawn avenue, about 240 feet from Wood street, and the underdrain was to have been connected with an underdrain that was supposed to be there, running to and connecting with an underdrain on Wood street, and the sewer was to have run in a general northerly direction, with branches leading into different cross streets. When the plaintiff dug down to start the sewer and the underdrain connected therewith, he did not find any underdrain on Woodlawn avenue. The matter was then taken up with the commission, and the commission decided, in order to complete that part of the sewerage system, to have the plaintiff put in an extra two hundred and forty feet of underdrain on Woodlawn avenue, which was the only additional amount that was required to connect with Wood street, the price to be paid being the same as the price paid for the rest of the work. The underdrain on Woodlawn avenue was to be connected with the main underdrain on Wood street.

The claim on behalf of the plaintiff, in the beginning, was that he was misled by a material though innocent misrepresentation as to the existence of this underdrain on Woodlawn avenue. This claim was later abandoned and it was admitted that while there was a misrepresentation as to the existence of an underdrain on Woodlawn avenue, it was not a material one and had no effect whatsoever upon his work, except to cause the construction of an extra 240 feet and did not give rise to his present claim. It simply resulted in his having to build an extra section of sewer for which he received compensation.

When the plaintiff opened up the underdrain on Wood street to make a connection with the new underdrain that he had constructed on Woodlawn avenue, a stream of water gushed out. He claims that he was told that the underdrain on Wood street was a working underdrain and that the fact that this stream of water gushed out and continued to come from that underdrain for a considerable period of time showed that it was clogged up and hence it was not a working underdrain. It is for the work done in pumping out the water which came from this Wood street underdrain and for incidental damages due to the water coming into the trench that he was digging and had dug on Woodlawn avenue, and that he was digging and had dug on the rest of the system included in the original contract that he seeks to recover in this proceeding, claiming that to entitle him to recover, he is not obliged to have the same allowed by the engineer as extras.

The defendant, on the other hand, claims that to entitle the plaintiff to recover, he is obliged to have the same allowed by the engineer as extras, and this is the real specific question raised in this case, and a subordinate question is as to whether, if this is not included in the term "extras," as provided in the contract, and the plaintiff merely claims, as he does, that he was damaged by the town dumping a lot of water upon him, he can recover against the town in an action of assumpsit, or whether he must seek to recover against the town for a tort.

The plaintiff, in order to maintain his contention that the pumping referred to in his bill was not included in the contract and was not to be considered under the head of extras in the contract, maintains that the underdrain on Woodlawn avenue had nothing whatsoever to do with the contract, and hence that the pumping was not required in connection with anything that he was doing under the contract.

One of the main items of damages for which the plaintiff seeks to recover on account of this water coming in upon

him is for delay to the work that he was required to do under the contract itself. The defendant claims that while the underdrain on Woodlawn avenue was not originally expressly referred to in the contract, yet it was such work as was impliedly required by the contract, as under the contract Mr. Callan agreed to "do and perform all the work, and furnish all tools, implements and materials, which may be required for the construction of sewer and appurtenances, in accordance with the specifications herein contained, and in accordance with the plans and directions made and *to be made* from time to time as the work proceeds."

If there was no underdrain along this short stretch of 240 feet, there would not be a complete sewer system. To provide for the changes or alterations, or extensions that might have to be made, this provision with reference to the work being done, not only "in accordance with the plans and directions made," but also in accordance with the plans and directions "to be made," was put in. Further, under the head of "additional work, etc.," there is the following provision: "If so directed by the engineer, the location of any existing work shall be changed to meet the requirements of the sewers or appurtenances, and new work shall be added when necessary, to leave all in good working order. Any changes or new work above indicated are to be paid for as extra work, solely on the valuation of the engineer, but depending on his decision whether the work done is, or is not, included in the work required of the contractor under this contract."

The plaintiff claims that this provision as to new work refers to new work added to existing work that has to be changed to meet the requirements of the sewers or appurtenances. The provision however says "and new work shall be added when necessary, to leave all in good working order."

Further, this underdrain on Woodlawn avenue could be considered as added to existing work, whether it is considered that the new underdrain was extended down Woodlawn avenue to Wood street, or from the old underdrain on Wood

street to the new underdrain that was to commence at the
point originally designated on Woodlawn avenue. That
would be adding new work to existing work where it was
"necessary, to leave all in good working order," and such new
work was "to be paid for as extra work, solely on the valu-
ation of the engineer, but depending upon his decision as to
whether the work done is or is not, included in the work
required by the contractor under this contract."

It seems that the underdrain on Woodlawn avenue was
reasonably necessary and incidental to the original contract
and this seems to have been the idea of the plaintiff's
attorney at the time of the trial. At that time he said:
"In the first place there was no sewer constructed upon
Woodlawn avenue unless it connected with something. He
wouldn't construct a sewer there, beginning without any
connection and pumping a lot of water into Woodlawn
avenue. It presupposes on the very face of it that he con-
nected there at Woodlawn avenue with some other drain
. . . "

It seems therefore that, under this agreement, the addi-
tional work required to be done on Woodlawn avenue, was
included in the contract which as we have seen provided that
"new work shall be added when necessary, to leave all in
good working order." But even if it was not comprehended
in the original contract and was later ordered to be added, we
think, as was ruled by the presiding justice that the doing of
this work amounted merely to a modification of the original
contract in this respect, and that, in all other respects, the
contract remained in full force. The witness received for
this work sixty-five cents a foot, the same price that he had
bid for eight-inch pipe sewer. He got his pay for this work
in the regular routine, that is, from the town treasurer.
It came along with the payments on the rest of the job, in
the regular routine of payments on the contract. This
work on Woodlawn avenue, he apparently did under the
supervision of the engineer or his assistant. He himself
says that when the water came out upon him at Wood street,

he complained to Mr. Craig, the representative on the work. Mr. Craig was the assistant of Mr. Gray. His offer to show that the assistant engineers representing Mr. Gray knew about the water coming in upon him and its effect upon the work, and his conversations with them about it, appear to indicate that this Woodlawn avenue job came within the purview of the original contract and was so understood and treated by Mr. Callan. That it was not necessary as a temporary devise during the work, but was necessary as a permanent structure to complete the system is shown by the testimony on page 127 of the transcript, where the plaintiff said he wanted to wait until he had finished his job and completed his system before he put in that connection. Clearly therefore this connection was necessary in order in the words of the contract "to leave all in good working order." The contract as made must, we think, be considered a modification of the original contract, to the extent of adding 240 feet of construction, or, if considered a new contract, it was a new contract under the same terms and conditions as the original contract. That it was so understood by the parties appears from their procedure thereunder.

The claim presented to the town of Bristol and attached to the declaration, and which must have been presented to have permitted the plaintiff to have brought this suit was introduced in evidence. The claim states that the plaintiff "by contract with the sewer commissioners, and by contract with said town of Bristol," had done certain extra work and been put to extra expense outside of the plans and specifications and that he presents the following therefor. The bill refers to "extra work done in connection with the construction of the East Side Sewer System" and starts off as follows: "Work done on Woodlawn avenue where under-drain was on top of pipe so that connection could not be made."

The items of the first three days of the bill refer to that work. On the third day, the 9th of November, he dug the outlet on Wood street. This corresponds with his testimony

that it took two and one-half or three days to dig the trench on Woodlawn avenue.

Plaintiff argues, however, that he did not mean to use the words "extra work" in their ordinary, technical significance. The contract provided: "Any changes or new work above indicated are to be paid for as extra work." The plaintiff used exactly the same words, "extra work," although in his bill a number of extra materials are included. He includes in his bill a large number of items which relate clearly to "extra work" within the meaning of the contract, and these items were allowed by the engineer and paid.

The contract provides: "All disputes in relation to execution, construction or completion of the work; or the quality or quantity of work or materials, or to the interpretation of the plans or specifications bearing on the work, shall be submitted to the engineer, whose decision on all points of dispute will be final and not subject to review; and he shall have the right to correct any errors or omissions therein, when such corrections are necessary to the proper fulfillment of the intention of said specifications or plans, the action of such correction to date from the time that the engineer gives due notice thereof." Again it is provided: "And the contractor hereby further agrees, that no claims for extra work shall be made unless the same shall be done in pursuance of a written order from the engineer." There is some question as to whether this work on Woodlawn avenue had to be ordered by the engineer in writing, if such writing had not been waived by the commission. Such new work was to be paid for as extra work, but whether it had to be ordered in writing as other extra work is not clear. But whether it had to be ordered in writing, or was new work under the contract, or extra or additional work under a modified contract, is immaterial as the work has been done and paid for and the determination of this question does not affect the right to recover in this case.

There is also the following provision: "It is hereby mutually agreed by the parties to this contract, that the

value of any such extra work so claimed (that is, extra work done pursuant to a written order of the engineer) is to be determined by the engineer, and that his decision thereon shall be final and binding upon both parties." And again the contract sets forth fully when and how and under what circumstances the final payments should be made, and then provides as follows: "And the said contractor hereby further agrees that he shall not be entitled to demand or receive payment for any portion of the aforesaid work, except in the manner set forth in this agreement."

The evidence shows that Mr. Gray allowed Mr. Callan all the extras that he thought he was entitled to, and that everything that he allowed has been paid. Even if this was entirely outside of and independent of the contract, this would not permit the plaintiff to recover in this case. He agreed to lay the underdrain on Woodlawn avenue for a certain price and unless this was made subject to the written contract, he was entitled to no further compensation for work incident thereto, even if such work was much more than he had anticipated. 30 Am. & Eng. Encyc. of Law, 2d Ed. 1279, 1280. If the work on Woodlawn avenue was within the contract, or within the contract as modified, or extra work under the contract, he could not recover in this proceeding for not only does the contract not provide for such recovery, but it expressly forbids it. Under the contract the contractor is "to do all pumping," etc.

There is also in the contract the following provision: "And the contractor hereby further agrees to receive the following prices in full for furnishing all materials, whether enumerated or not, and all labor required in the aforesaid work; also for all loss or damage arising out of the nature of the work aforesaid, or from the action of the elements, or from any unforeseen obstruction or difficulties which may be encountered in the prosecution of the same . . . and for well and faithfully completing the same and the whole thereof in the manner and according to the plans and specifications and requirements of the engineer under them."

There is also a provision for monthly estimates. The contract clearly provides for what and how the contractor should be paid and he is limited strictly to such recovery. In *Lee* v. *Brayton,* 18 R. I. 233, the court said: "The respondent concedes that the petitioner is entitled to a lien for the $325, the last installment of the contract price, but contends that the blasting of rock and the other items charged in the account for labor and materials were extra work and therefore, that the petitioner is not entitled to a lien therefor, because clause 13 of the contract provides that no claim shall be made for extra work, unless the same shall have been done in fulfillment of a written order from the architect, and also such claims shall be made in writing to the architect and if allowed by him shall be approved and endorsed on the contract after the next ensuing payment, and that no such endorsement appears on the contract.

"We are of the opinion that the blasting of rock being particularly mentioned in the specifications accompanying the contract, is to be regarded as work done under the contract, and not as extra work, within the meaning of clause 13. It was work provided for in the contract and necessary for the completion of the house in accordance with it, since the drains mentioned in the specifications could not be excavated without the blasting and removal of the rock. It is true that the amount to be paid for it was extra, outside of or in addition to the price to be paid for the other work; doubtless, because it could not be known until the excavation had been made how much blasting was necessary, or how expensive it would be; and, therefore, no estimate of its cost could be made beforehand; but the fact that the cost of it was thus left indeterminate, and was to be paid in addition to the price for the other work did not render it extra work, for; as we have said, the written contract provided by necessary implication that it should be done."

The fact that it was stated that the underdrain on Wood street was a working underdrain would not authorize recovery.

As to the existence of an underdrain on Woodlawn avenue the plaintiff admits that the only way he was misled was by seeing a representation of such an underdrain on a plan that was shown him and that he was not misled in anything that was material, in other words, whatever misrepresentation there was was not a material misrepresentation. It is not claimed that there was any fraud in this respect. It is merely claimed that the exhibition of this plan constituted an innocent misrepresentation of a fact which turned out not to have been material. This plan was not one of the plans referred to in and made a part of the contract, but was merely a plan of the whole Bristol sewer system. It was not one of the plans referred to in the "Notice to contractors" as being able to be seen "at office of the commission, or at the office of the consulting engineer."

In this connection it is to be noted that the "estimated quantities are approximate only, and the said commission therefore expressly reserves the right of increasing or diminishing the same, as may be necessary in the judgment of the engineer." So far as this contract is concerned the plan does not enter into it and has nothing to do with it.

As to the statement alleged to have been made that there was a working underdrain on Wood street, it is not claimed that that was fraudulently made, but it is claimed that it was a misrepresentation because when the underdrain was opened some time afterwards, it is claimed that it was in some way clogged up. It is not clear that there was even a misrepresentation in this connection. Assuming that it was stated that this was a working underdrain, there was certainly no guaranty that it should not be filled with water at any particular point on account of the large amount of moisture in the ground and the large flow of water rendering it impossible to take care of the water fast enough. Such a drain which is more or less open and porous is merely to assist in caring for the moisture in the ground and on account of its porous nature is very apt to have dirt or sand washed into it. It might well have been "working" when the state-

ment was made and thereafterwards become clogged up or filled up. There is no evidence as to what stopped it up, if it was stopped up, nor as to how long it had been stopped up. Even if there was a misrepresentation of an under-drain, this would not permit the plaintiff to recover. In *Cunningham* v. *City of New York*, 79 N. Y. Supp. 401, the plan of a sewer which the plaintiff was to construct had on it lines which showed an existing sewer which would have furnished drainage during the progress of the plaintiff's work, and with which sewer the sewer that was to be con-structed by the plaintiff was to connect and both plaintiff and defendant entered into the contract in contemplation of that fact. There was an intervening building which the city was to remove, but had not removed and hence the plain-tiff was required to commence at another point than the connection with that sewer. He completed his contract and received his pay therefor and then brought suit to recover damages for extra work in pumping and other respects, but recovery was denied him, the court saying: "The contract is in writing. Its terms are clear and unambiguous, and so far as I have been able to discover, it contains no reference to any existing sewer, and makes no provision for any outlet for water in the excavation during the progress of the work, excepting the marks or lines upon the plan which are said to show the existence of a sewer in Lafontaine avenue; but I doubt very much whether the designation of such a sewer upon a plan could overcome the plain language of the con-tract. *Dean* v. *City of New York*, 167 N. Y. 13, 60 N. E. 236."

In *Stuart* v. *Cambridge*, 125 Mass. 109, the plaintiff was to dig to any depth necessary to secure a solid foundation. It developed that they had to drive piles to secure such foundation. The court said: "The evidence offered by the plaintiffs, that they made their estimate according to a plan made by the defendant's architect, showing a section of the wall which required only a depth of 14 inches, and did not require any piles and that it was customary for other persons

to make estimates in similar cases in the same manner, was incompetent, because it tended to control and vary the written contract."

Evidence that the architect told plaintiff to go ahead was held to be inadmissible because: "The written contract carefully provides that any additions to or deviations from the plans and specifications shall be directed in writing by the committee or architect, and that 'it is expressly agreed that no alterations or additions are to be paid for unless so directed in writing.'  .  .  .  This clause was intended to protect the defendant against claims for extra work under alleged oral directions or contracts."

In *Thilemann* v. *City of New York*, 81 N. Y. Supp. 773, there was no sewer at the place indicated on the map. It was provided that the contractor should, at his own expense, keep all the trenches free from water. Had there been a sewer available, expensive pumping would have been avoided. The plaintiff sought to recover for this pumping. The court said that "the city entered into no contract, express or implied, that it would supply a sewer that would drain off the water, but, on the contrary, the contractor agreed to supply the necessary pumps and facilities for that purpose" and denied recovery.

The plaintiff is not entitled to recover for the pumping as the pumping out of water from whatever source it came was a part and parcel of his original contract, or, if there was an entirely new and independent contract, then it was a contract to do certain work for certain compensation and there was no provision for extra compensation if the work turned out to be greater than anticipated. If more work was involved for any reason than he expected, and that was properly chargeable against the town, he would have to recover for it as "extra work" after it had been allowed by the engineer. But the contract provides "that no claims for extra work shall be made unless the same shall be done in pursuance of a written order from the engineer." Under these circumstances without such written order no recovery

can be had. *Stuart* v. *City of Cambridge*, 125 Mass. 102; *City of Hutchinson* v. *White*, 101 Pac. 458, at 459. Nor can the engineer waive any of the provisions of the contract. *Stuart* v. *City of Cambridge, supra; Cashman* v. *City of Boston,* 190 Mass. 215.

In *Molloy* v. *Village of Briarcliff Manor*, 129 N. Y. Supp. 929, at page 936, the court said with reference to a similar provision as to extra work: "Concededly no written orders were given for this particular work and there is no proof of any waiver by the defendant. A provision of this kind cannot be waived by the engineer."

(3) The plaintiff offered to show that the inspector or assistant engineers knew about the extra work he was doing and he notified them that he should demand extra compensation. The duties of the assistant engineers were limited to the particular duties entrusted to them, and not even the engineer himself could waive any of the provisions of the contract. See cases cited *supra.* Knowledge that the work was being done will not create a promise to pay. *Beattie et al.* v. *McMullen et al.* 74 Atl. (Conn.) 767, at 773; *Harrison Granite Co.* v. *Stephens*, 160 Mich. 51; *James Reilly Co.* v. *Smith*, 177 Fed. 168. But even if he was entitled to recover for pumping as extra work and there was a waiver of the order in writing, his claim for extra work was, as the court said, subject to all the conditions of the original contract. *Beattie et al.* v. *McMullen et al.* 74 Atl. (Conn.) 767, at 773. In this case the plaintiff "agrees that he shall not be entitled to demand or receive payment for any portion of the aforesaid work, except in the manner set forth in this agreement."

(4) The plaintiff in his brief claims that "the parties saw fit to treat it (the work on Woodlawn avenue) as entirely outside of the written contract, as shown by the fact that it was not ordered in writing or otherwise by the engineer, was not submitted to him by either the commissioners or the plaintiff for his allowance, that it was paid in violation of all the provisions of said contract as to ordering, allowing and

paying.   No percentage of this contract was withheld for a certain time, as required by the main contract, etc."

That the Woodlawn avenue extension was not ordered by the engineer in writing is true, but it was ordered by the commission and was new work necessary to put the system in working order, and hence was to be treated as an extra or as a modification or extension of the existing contract.

It is true there is testimony that the plaintiff agreed upon a certain price with the commission, but there is no testimony that the commission did not consult Mr. Gray and that Mr. Gray did not fix the price.   But if he didn't, the commission could waive that provision.   But in every other detail the original contract was followed literally.   Mr. Callan never rendered any bill for it, but received his pay in the regular routine, *i. e.,* it came along with the payments on the rest of the job, on the contract.   As the trial justice said:   "The evidence has shown on Mr. Callan's testimony that he got his payments along in regular course, including payments for some of these items which now appear in his declaration under what counsel have referred to as a bill of particulars."

The plaintiff claims in his brief that the construction of this 240 feet of underdrain was not an incidental change made necessary in the progress of the work; that it was necessary before the work commenced and at the place of beginning.

We do not think it has to be an incidental change made necessary during the progress of the work.   As a matter of fact it appears that the necessity for it was discovered after the work was begun.   The plaintiff was required to make a sewer in accordance with plans and directions made and to be made from time to time.   The contract also provided that new work should be added, when necessary, to leave all in good working order.   This work was added to the work originally specified and the plaintiff was bound, under his contract, to do that work.   It is not necessary to bring this within the clause that the engineer might make any changes in the forms, dimensions, grades, alignments, or materials

of the work, provided such changes do not materially affect the amount or value of the work to be done, but, if it was necessary to do this, that clause is broad enough to cover this work. The failure to get the engineer's written order, unless waived by the commission, would merely prevent the plaintiff's recovery.

We think, however, that the other portions of the contract are the portions that authorize this change, and even if it did not come within any provision of the contract, that the contract was so modified as to include the additional work.

Plaintiff further says that it was not a dispute in relation to execution, construction or completion of the work, or a dispute as to the quality or quantity of work or materials, or to the interpretation of the plans or specifications bearing on the work, to be submitted under the contract to the engineer, but he fails to note in that paragraph the provision: "And he (the engineer) shall have the right to correct any errors or omissions therein when such corrections are necessary to the proper fulfillment of the intention of said specifications or plans, the action of such corrections to date from the time the engineer gives due notice thereof." He claims, as the contract merely covers a sewer running northerly from Woodlawn avenue, that the plans cannot be corrected so as to include a sewer or underdrain on Woodlawn avenue to Wood street. If the purpose of the contract was merely to have a disconnected portion of a sewer, there might possibly be some foundation for his argument, but to have a piece of a sewer, without any outlet, or to have several disconnected underdrains, cannot be conceived of as being within the understanding of the parties. The purpose of the contract was to have a sewerage system for the town of Bristol, not to have several disconnected sewers or several disconnected underdrains, and, consequently, when it was found that there was no connection at the point where it was supposed there was a connection, a short amount of extra pipe had to be added to make that connection. It is not like adding a dozen or more side streets. While Woodlawn avenue is a

side street, it furnished the only connection that there was between that portion of the sewer that Mr. Callan was building and Wood street. That section of the sewer needed an outlet on to Wood street, and so that was a part of the work that was necessary. If there was any dispute as to the necessity for that, that was for the engineer to pass upon.

The provision as to the order for extra work being in writing, may, of course, be waived by the commission. Furthermore, it is provided that new work was to be added, when necessary, to leave all in good working order, and, therefore, such new work is not required to be in writing, but the new work is to be paid for as extra work. The commission ordered the new work and it would have to be paid for in that way, unless that provision of the contract was waived. He says that the price agreed upon for the laying of the pipe was the same as for laying other similar pipe. If that was so, there would not have to be a special valuation by the engineer, but the contract would be modified to that extent. That it was treated as in the nature of extra work is shown by the bill rendered, which includes work done on Woodlawn avenue; three days' digging of the trench and other things of that nature.

It is clear that that agreement simply affected changes that were made in the contract and nothing else. For eight-inch underdrains, he was to get thirty cents per linear foot, but he was authorized to put in an eight-inch sewer pipe to be used as an underdrain, and for this he was to get the price of that, namely, sixty-five cents a foot. All the other charges and provisions were to be the same as in the old contract and, consequently, no changes had to be made. Assuming that it was a new contract and was made such by the parties, instead of its being ordered as extra work by the engineer, that would not prevent it from being merely a modification of the original contract and being subject to all the terms and provisions of the original contract, and to make that change would not require any authorization in the contract, although

such authorization is contained therein. But any contract can be modified by mutual agreement of the parties.

The plaintiff says that the provision that the engineer shall have the right to correct any errors or omissions therein when such corrections are necessary to the proper fulfillment of the intention of said specifications or plans does not apply, because here the intention was to build a sewer northerly.

But it was also the intention to have that sewer and the underdrain connected with the main sewer on Wood street, running from north to south, but flowing southerly. It was supposed that this connection could be made where this sewer, running northerly, struck Woodlawn avenue. It was found out that this was an error and that the sewer and its underdrain would have to be continued 240 feet to the corner of Wood street and Woodlawn avenue, to make this connection.

Plaintiff attempts to make the situation as if the commission had employed a third person to dig the underdrain to Wood street and as a result, the water had been turned upon the plaintiff. If such a thing as that had occurred and there was a provision in the contract for the payment of any extra work that was necessitated in the doing of the work and that payments should only be made in one way, that would be the limit of the plaintiff's right to recover, and if it was not the limit of his right to recover, then he would have to recover as for a tort rather than upon an implied contract.

In this case, plaintiff seeks to recover the entire amount authorized by the contract and its amendment or modification, besides all extras that the engineer will allow, and then bring suit for such work as the engineer refuses to allow. The plaintiff admits that he went on with the work under the immediate supervision of the engineer and his assistants and of the commission. If he did not consider that this work was included in some way under the written contract, why did he go on with the work under the supervision of the engineer and his assistants? The authority of the engineer and his assistants was fixed and limited by the contract.

The court did not grant a nonsuit because the plaintiff failed to submit his extra charges to the engineer, but because, in the court's opinion, he was at all times acting under the original contract, as modified, and his claim for extra work was subject to all the conditions of that original contract, namely, approval by the engineer of the doing of the work, fixing of the price by the engineer and all those elements of the original contract. This approval the plaintiff did not have.

The court furthermore decided that if the plaintiff had any right at all to recover on the last theory advanced by him that there was no implied assumpsit; that the plaintiff's remedy would be in case for tort.

The plaintiff further says that the town did not agree that the work done was extra work.

There is no support for this in the testimony. The town admits that the work, so far as covered by the contract, was extra work and such allowance therefor was made as it was thought should be made.

If there had been a fraudulent misrepresentation as to the underdrain in Wood street and this had been a material misrepresentation and had induced the contract, the plaintiff could rescind the contract after the discovery thereof and sue on a *quantum meruit* or he could ratify the contract and sue in deceit for damages. In this case, however, whatever misrepresentation, if any there was, was an innocent one and not of such a character as to permit a rescission of the contract. 9 Cyc. 408. Even if recission could have been had, the plaintiff did not rescind, but elected to affirm the contract.

The plaintiff finally abandoned his claim as to a mistake in the inducement of either contract and rested his claim solely on the wrongful act of the town in opening up a drain on Wood street and pouring water in upon him. There is no testimony that the town did this. Further, this would not render the town liable on the common counts in assumpsit on an implied contract to pay for pumping the water out

and the damages resulting from letting the water in. The plaintiff's remedy, if any, would be for a tort. *Webster* v. *Drinkwater*, 5 Me. 319; *Tightmeyer* v. *Mongold*, 20 Ks. 90; *Fanson* v. *Linsley*, 20 Ks. 235; *Carson River Lumbering Co.* v. *Bassett*, 2 Nev. 249.

The cases cited by plaintiff's counsel in their brief are all distinguishable from the case at bar.

The nonsuit was properly granted.

The plaintiff's exceptions are overruled and the case is remitted to the Superior Court for the entry of judgment upon the nonsuit.

*A. B. Crafts, William H. McSoley,* for plaintiff.

*William T. O'Donnell, Waterman & Greenlaw,* for defendant.